**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

_____
                              )

**VICTOR E. CRETELLA,**         )

         )

     **Plaintiff,**        )

         )

     **v.**                )      **CIVIL NO.   3:08CV109**

         )

**DAVID L. KUZMINSKI,**      )

         )

     **Defendant.**       )

_____)

## MEMORANDUM OPINION

This matter is before the Court on Defendant David L. Kusminski's Motion to Set Aside the Verdict.  (Docket No. 67.)  The relevant issues have been extensively briefed.  The Court will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and argument would not aid in the decisional process.  For the reasons set forth herein, the Motion to Set Aside the Verdict will be GRANTED IN PART, DENIED IN PART and DENIED CONDITIONALLY IN PART, depending on whether Plaintiff accepts the remitted awards as determined by the Court herein.

## I.  Factual Background

Plaintiff, Victor E. Cretella, III ("Cretella"), filed the action in February 2008, alleging that Defendant, David L. Kuzminski ("Kuzminski") had defamed him on several occasions in a series of web-postings he had posted on his personal webpage and on an on-line forum known as the Absolute Write website (www.AbsoluteWrite.com, hereinafter "Absolute Write").  (Compl. ¶

¶ 6-15.)[1]  Specifically, Plaintiff alleged that Kuzminski had made several false and defamatory statements which included questioning Plaintiff's ethical conduct as a practicing attorney, accusing him of the criminal act of extortion, and stating that Plaintiff had been discharged from his employment with a law firm as a result of such conduct. (Compl. ¶ ¶ 6 -15.)  In response, Defendant asserted that he had not defamed Plaintiff, but had used constitutionally-protected and/or otherwise appropriate means to lodge complaints concerning Plaintiff's conduct in order to lawfully warn others of Plaintiff's actions.  (Answer at 1.)

Plaintiff is a licensed attorney who practices in the state of Maryland, and is currently employed as in-house counsel for the publishing company PublishAmerica, Inc. ("PublishAmerica").  (Tr. 56-57.)[2]  Before becoming employed at PublishAmerica, Plaintiff practiced law at a small law firm in Maryland.  (Tr. 63.)  During the course of his employment at the law firm, Plaintiff was introduced to one of the owners of PublishAmerica.  (Tr. 64.) Plaintiff thereinafter accepted PublishAmerica as one of his clients in 2001, and proceeded to represent the Company in several matters, including contractual issues, intellectual property claims, and other legal issues related to the publishing business.  PublishAmerica remained one of Plaintiff's clients through 2007, when Plaintiff left the law firm and accepted the position as in-house counsel with the company. (Tr. 69.)

PublishAmerica is a publishing company that utilizes a digital press system.  (Tr. 67.)  A digital press system provides the capability to publish as many, or as few, publications as desired at any given stage.  (Tr. 67.)  Thus, with such a system, a publishing source does not have to

---

[1]  All references to the Complaint refer to Plaintiff's Amended Complaint, filed April 24, 2008 (Docket No. 11).

[2]  All citations to the transcript refer to the transcript of the jury trial before this Court on February 3-4, 2009 (Docket Nos. 75 & 76).

publish a certain number of copies of a particular work in advance; but instead, it can determine

the existing demand for the publication first, and then publish only the number needed to meet

the existing demand.  (Tr. 67; Pl.'s Ex. 51.)[3] Such a system reduces the publishing company's

overhead costs and allows it to publish unknown authors who may not be able to attract the

interest of larger publishing firms, or publish their work without being responsible for substantial

fees.  (Tr. 67; Pl.'s Ex. 50; Pl.'s Ex. 51.)  As a consequence of using a digital press system,

publishing companies like PublishAmerica do not typically "mass produce" the books that they

publish, and as such, they do not engage in the type of broad promotion the way that larger

publishing houses might.  (Tr. 66-67; Pl.'s Ex. 51.)  As a consequence, PublishAmerica

emphasizes on its website to all of their new or potential authors that while they do sell their

publications to large retailers such as Barnes and Noble and Amazon.com, the author bears the

personal responsibility of promoting their own publications if they desire to be contacted by such

large book retailers.  (Pl.'s Ex. 51; Tr. 73.)

From 2001 until his acceptance of an in-house counsel position with PublishAmerica in

2007, Plaintiff worked on various projects with the company as one of his clients, including

author disputes, representing the company in arbitration proceedings, intellectual property cases,

and landlord disputes.  (Tr. 69, 92-93.)  One such project, viewed by both parties as the impetus

of this case, was a letter that Plaintiff sent on behalf of PublishAmerica to a Ms. Christine Norris,

an author and Absolute Write website participant[4], in February 2007.  (Tr. 70; Pl.'s Ex. 8.)

---

[3]  For the sake of efficiency, the Court cites to Plaintiff's exhibits alone, as a majority of
the exhibits relying upon are duplicative of the ones offered by Defendant.  As to avoid
unnecessary string citations, the Court relies on citations to the Plaintiff's exhibits for clarity
sake.

[4]  Although it is not clear from the transcript or the exhibits, it is the Court's
understanding from the parties testimony at trial that Christine Norris is an author, and from the
letter sent by Mr. Cretella on behalf of PublishAmerica, as well as the portions of

Plaintiff testified at trial that he had sent Ms. Norris the letter because she had posted comments on the Absolute Write website in which she referred to PublishAmerica as a "scam." (Tr. 74.) Plaintiff testified that the letter was meant to explain to her that her statements were false, and that they constituted defamation for which she could be liable. (Tr. 70; Pl.'s Ex. 8.) In his letter, Plaintiff also indicated that Ms. Norris should consult the PublishAmerica website where she would find that their policies and procedures were clearly outlined and quite proper. (Tr. 70-73; Pl.'s Ex. 8.) Ms. Norris did not respond directly to Plaintiff; rather, she posted the following message on the Absolute Write website board on February 7, 2007:

> "YOU HAVE TO BE KIDDING ME!!
>
> WTF? Tonight a courier shows up at my door. Inside is a lovely letter from our friend VCretella. Within, among a long list of my quotes from THIS MESSAGE BOARD, they tell me that I cannot call PA a scam.
>
> No. Seriously. They went to all of the trouble to look up my home address and paid a courier service to deliver it. I feel so special. Three pages of things I've said and why what I said is a lie. If I don't cease and desist, that they will sue me. Oh, and that they've send [sic] a bunch of things I've said to the AG's office. As if. I'll believe it when the Feds show up.
>
> Yanno what, PA? Bring. It. On. I'm sure I could find a lawyer (or one will volunteer…Jaws, you listening?) to take you on in court.
>
> Oh, and if I call them on the phone and discuss a 'settlement', they won't file charges or seek the damages in 'excess of $100,000' . . .
>
> OFFICIALLY, I believe PA to be a less than truthful about their business practices. I believe their sole purpose is to sell books to their authors, Instead of using the business plan of mainstream commercial publishers. This is clearly my opinion, based on facts and anecdotal evidence."

(Pl.'s Ex. 13.) Ms. Norris continued to discuss the receipt of the letter on the Absolute Write website, and it appears from the Record, although it is not entirely clear, that Plaintiff sent Ms.

---

www.absolutewrite.com "Water Cooler" discussion forum provided by both parties as exhibits in this matter, it appears that at the time the letter was sent, Ms. Norris was a frequent poster on the website discussion group board.

Norris a second, so called, "cease and desist" letter.[5]  (Tr. 75; Pl.'s Ex. 17.)  After receiving the

second letter, Ms. Norris posted the following message on the Absolute Write message board:

> I'm done.  I don't have time to play games with you, Vic.
>
> You send me another letter and I PROMISE you I will find the sharkiest
> lawyer I can and he will eat you for lunch.  The people of this board WILL see
> that I can afford it.  And you can bet your bottom dollar I will send a copy of
> every last thing you send me to the press, along with links to a thousand other
> places who echo what amounts to MY OPINION.
>
> For the moment, I'm gone.  Don't send me another packet full of photocopies
> from this board, full of other people's posting where they ALSO say PA is a
> scam, and don't threaten me for proclaiming what really amounts to my
> opinion, or you WILL see what kind of mess you've made.
>
> There are a thousand others where I leave a place.  I have yet to figure out
> why you've targeted me at all!  Maybe my lawyer will see how you like a
> harassment suit.  Because I don't have any money, I'm not worth anything,
> and I'm not a 'big name' you can discredit.  So please explain it to me!  What
> the hell did I ever do to you that a THOUSAND other people have not?
>
> You need better ways to spend your time, Vic.  Leave me alone.  I've got
> better things to do than deal with you and your piddlings.

(Pl.'s Ex. 17.)  In response to Ms. Norris' post, several members of the website community

expressed their concern and distaste for the letter, and several offered to assist her in funding

legal representation of her if the situation escalated.  (Pl.'s Ex. 17; Pl.'s Ex. 18; Pl.'s Ex. 19.)

One such responder was Defendant David L. Kuzminski, an author, Absolute Write community

member, and the administrator of the website Preditors & Editors.[6]  On February 16, 2009, in

---

[5]  Although the letter is not in the Record, not having been offered by either party as an exhibit at trial, Plaintiff testified at trial that he sent a second letter, which is when he contends Ms. Norris "gave up" her posting any comments against PublishAmerica on the internet.  (Tr. 75.)

[6]  The Preditors & Editors website maintained by Defendant is a "guide to publishers and publishing services for serious writers."  (Pl.'s Ex. 1.)  Defendant utilizes the website to inform authors who are unfamiliar with the world of publishing about recent news and reviews of different publishing companies, as well as literary resources.  (Tr. 198, Pl.'s Ex. 1.)

response to the discussion initiated by Ms. Norris' correspondence with Mr. Cretella, Mr.

Kuzminski posted the following message on the Absolute Write discussion board:

> I say it's time to report Vic Cretella to the Maryland Bar Association for
> attempted extortion.  Let them sort it out and decide whether that's what he's
> involved in or not.
>
> Let's not forget his law firm.  They might not know what he's doing.  They
> might not want the blackeye [sic] he's giving them.

(Pl.'s Ex. 19.)  Approximately forty-five minutes later, on the same website, Defendant also

posted a draft of an e-mail that he had sent to twenty-nine e-mail addresses, who he testified at

trial he believed to be the addresses of the members of the Maryland State Bar Association legal

ethics committee for the legal profession.  (Tr. 196; Pl.'s Ex. 20.)  In the e-mail, Kuzminski

stated that "Mr. Cretella seems to be involved in what I would characterize as extortion," and he

informed the reader that he intended to report Cretella to the State Bar Association for

disciplinary action.  (Pl.'s Ex. 19.)  Shortly thereafter, Defendant also posted a notice on the

same message board requesting that, if other readers had "documentation about PA or Vic", to

forward the information along to the same e-mail addresses, or "offer to give it to the Maryland

State Bar Association to use in considering whether to administer disciplinary action to dear ole

Vic."  (Pl.'s Ex. 19.)

During the same time period, Plaintiff decided to leave his job at the law firm where he

had been employed for some time, and after a brief search, he accepted an offer as in-house

counsel with PublishAmerica. (Tr. 79-80.) At trial, Plaintiff testified that he had felt as though it

was time to leave the law firm due to his concerns about the firm's operations and business plan,

and that he wanted to "test [his] value in the market place."  (Tr. 77-78.)  When Plaintiff then

notified PublishAmerica of his decision to leave the law firm, they offered him the in-house

counsel position.  (Tr. 77.)  Plaintiff testified that he did not accept the position immediately,

because he wanted to see what other positions might be available, and because he had hired a "headhunter" to help him determine what career choices he had at the time.  (Tr. 78.)  The headhunter told him that that there might be one opportunity he could pursue, but Plaintiff testified that he decided not to because "he was getting nervous" and "started having second thoughts."  (Tr. 78.)  Particularly, Plaintiff testified that he was worried because he had not engaged in such a job search before, he and his spouse were starting a family, and he had recently seen the postings by Mr. Kuzminski accusing him of extortion that he did not want to have to explain.  (Tr. 78-79.)  Thus, Plaintiff testified that he was embarrassed that potential employers might search the internet and view the comments by Defendant questioning his integrity as an attorney, and that he decided to "go with a safe employer" by accepting the PublishAmerica position in which he knew he would not be questioned about the situation.  (Tr. 79.)

In May 2007, after learning of Plaintiff's transition from the law firm to PublishAmerica, Defendant posted an announcement on the Absolute Write website that Plaintiff had become Publish America's general counsel.  Defendant commented in the posting that the board members could "only speculate on how much embarrassment he caused his former employer but PA's [sic] obviously thinks highly of him."  (Pl.'s Ex. 22.)  Other members on the website also speculated as to why Plaintiff had made the transition to PublishAmerica, suggesting a potential rise in litigation by or against PublishAmerica.  (Pl.'s Ex. 22.)  Ms. Norris, for example, posted concerns that the change in employment meant that Plaintiff would be able to "threaten people unchecked now," to which Defendant responded:

> Look at it this way.  Without his former firm vouching for him to the State
> Bar Association, he might be just that much closer to losing his license.  I
> think all of the letters of complaint we wrote to the authorities in MD might

have actually had some effect.  If that's so, then we do it again the very next
time he steps out of line again.

(Pl.'s Ex. 22.)  As the discussions about Plaintiff's career move to PublishAmerica continued,

Defendant posted comments on several different internet discussion boards as to the reasons he

believed Plaintiff changed his employment.  In one such post he stated:

> Well, before Vic's professional move, he was targeting a writer who
> frequents another board.  In response, a number of writers sent emails to
> various lawyers in Maryland who look over ethics among Md lawyers and
> such.  I also sent emails to over twenty such lawyers and included the law
> firm that Vic worked for at the time.  I suspect his sudden change of
> employment might have been due to the backlash against his attempt to
> attack that writer.  In other words, he'd been representing PA for a number of
> years now without any problems.  There's no other readily apparent reason
> for such a dramatic employment change.

(Compl. ¶ 11; Pl.'s Ex. 35.)  In another post on the Absolute Write website, Defendant again

attributed Plaintiff's new employment at PublishAmerica to the incident with Christine Norris,

and the complaints that had been made to the Ethics Committee:

> Vic had to leave his former employer after a certain party contacted the entire
> Ethics Committee for the Maryland Bar Association along with his employers
> after an attempt by Vic to extort payment to PA from an AW writer who
> expressed her opinion about PA on the AW site.

(Compl. ¶ 14.)

Defendant continued to participate on the message boards, while also writing on his own

website throughout the course of the year, often commenting, or "reporting," on

PublishAmerica's policies, author disputes, and offering input as a witness against

PublishAmerica in an arbitration proceeding.  One topic of discussion in which Defendant often

participated was that of the arbitration proceedings involving PublishAmerica, and one of its

authors, and contributor on the Absolute Write discussion forum, a Ms. Marie Pacha.  In July of

2007, Marie Pacha discussed her arbitration proceedings on the discussion board, and voiced her

opinion that PublishAmerica, with Plaintiff acting as their general counsel, had violated an arbitration provision in her contract with PublishAmerica.  (Pl.'s Ex. 3.)  In response to Ms. Pacha's post, another board member expressed the opinion that he couldn't believe that any lawyer would be as ill-prepared as Plaintiff, and that Plaintiff probably knew he did not have a winning case, such that he was ignoring the contractual provision in order to delay the proceedings.  (Pl.'s Ex. 3.)  In response to the posts, Defendant responded: "Seems to me ole Vic is demonstrating why he's no longer with his former firm.  I guess socializing only goes so far, doesn't it, Vic?  Somewhere along the line you actually have to produce."  (Pl.'s Ex. 3.)  A few days later, on his own Preditors & Editors website, Plaintiff posted the following:

> PublishAmerica's lawyer Victor Cretella infringing contract?  This is what we've had reported to P&E.  According to our source, Vic has infringed upon or is breaching the terms of a contract in regards to the Arbitration clause.
>
> So, is this how PA operates?  They don't honor their contracts or show any good faith even when it comes to negotiations and arbitration?
>
> By the way, anyone who has had dealings with an attorney in Maryland who knows they are in violation of the law or their ethics code can file a complaint against the attorney using the information at http://www.courts.state.md.us/attygrievance/complaint.html.  This site lists some of the sanctions applied to various attorneys.  According to our sources, sounds like it's time to report Vic for his behavior.

(Pl.'s Ex. 1; Compl. ¶ 13.)

In his original lawsuit, Plaintiff, proceeding *pro se*[7], alleged seven counts of defamation against Defendant based on his web postings on various web forums and on the Preditors &

---

[7]  The Plaintiff retained the services of present counsel of record while the case was pending.

Editors website.  (Docket Nos. 1 & 11.)  Two of the Counts were dismissed by the Court on

Defendant's motion, with the remaining five[8] to be resolved at trial.  (Docket No. 16.)

_____

[8] The remaining five counts at issue at trial were based on the following postings:

Count One Statements:

"I say it's time to report Vic Cretella to the Maryland Bar Association for attempted
extortion.  Let them sort it out and decide whether that's what he's involved in or not.
Let's not forget his law firm.  They might no know what he's doing.  They might not
want the blackeye [sic] he's giving them."

"Perhaps your office is unaware, but Mr. Cretella seems to be involved in what I would
characterize as extortion.  I've enclosed a copy of the documentation that leads me to
express this extreme displeasure with one of your lawyers because he appears to not only
represent a business I consider to be among the sleaziest in the world, but to be actively
consorting with them in furthering its unethical if not illegal methods.  I full intend to
also report him to the Maryland State Bar Association for disciplinary action.

Okay, folks, if you want to help, send an e-mail to those addresses. . . . If you have
documentation about PA or Vic, offer to give it to them Maryland State Bar Association
to use in considering whether to administer disciplinary action to dear ole Vic.  Hey Vic,
I hope you're reading this so you can include me on the offer you made to Christine."
(Compl. ¶ ¶ 7-9.)

Count Two Statements:

"I'm certain that Victor Cretella will be grateful for the work since he's now PA's
general counsel.  We can only speculate on how much embarrassment he caused his
former employer but PA's [sic] obviously things highly of him.  I guess he resonates with
them like a glove."

"Look at it this way.  Without his former firm vouching for him to the State Bar
Association, he might be just that much closer to losing his license.  I think all of the
letters of complaint we wrote to the authorities in MD might have actually had some
effect.  If that's so, then we do it again the very next time he steps out of line again."

Count Three Statements

"Well before Vic's professional move, he was targeting a writer who frequents another
board.  In response, a number of writers sent emails to various lawyers in Maryland who
look over ethics among Md lawyers and such.  I also sent emails to over twenty such
lawyers and included the law firm that Vic worked for at the time.  I suspect his sudden
change of employment might have been due to the backlash against his attempt to attack

In a defamation case, a plaintiff has the burden of establishing at trial that: (1) the defendant made the alleged statement; (2) the statement was about the plaintiff; (3) The statement was seen or heard by someone other than the plaintiff; (4) the statement was false; and (5) the defendant made the statement knowing it to be false or, believing it to be true, the defendant lacked the reasonable grounds for such belief or acted negligently in failing to ascertain the facts on which the statement was based.  (Jury Instruction No. 2, citing Mathew Bender & Co., Inc., Virginia Model Jury Instructions: Civil 37.020 (LexisNexis Group 2007)). Before trial, the parties stipulated to the following for use at trial:

---

that writer.  In other words, he'd been representing PA for a number of years now without any problems.  There's no other readily apparent reason for such a dramatic employment change."

"Seems to me ole Vic is demonstrating why he's no longer with his former firm.  I guess socializing only goes so far, doesn't it Vic?  Somewhere along the line you actually have to produce."  (Compl. ¶ 11.)

Count Four Statement:

"7/14/07: PublishAmerica lawyer Victor Cretella infringing contract?  This is what we've had reported to P&E.  According to our source, Vic has infringed upon or is breaching the terms of the contract in regards to the Arbitration clause.  So this is how PA operates?  They don't honor their contracts or show any good faith even when it comes to negotiations and arbitration?  By the way, anyone who has had dealings with an attorney in Maryland who knows they are in violation of the law of their ethics code can file a complaint against the attorney using the information at http://www.courts.state.md.us/attygrievance/complaint.html.  This site lists some of the sanctions applied to various attorneys.  According to our sources, sounds like it's time to report Vic for his behavior."  (Compl. ¶ 13.)

Count Five Statement:

Vic had to leave his former employer after a certain party contacted the entire Ethics Committee for the Maryland Bar Association along with his employers after an attempt by Vic to extort payment to PA from an AW writer who expressed her opinion about PA on the AW site.

1. That the Defendant, David L. Kuzminski, "published" and otherwise authored or wrote the various internet communications attributed to his e-mail address as contained in the various exhibits offered into evidence;

2. That such internet communications as originated by the Defendant were received and reviewed by various third party members of the general public; and

3. That all copies of all written documents, letters, or other form of written communications as are offered into evidence are authentic copies.

(Joint Ex. No. 1; Tr. 55-56.)  Thus, the only issues remaining for the jury, beyond that of

damages, was whether Plaintiff was the person spoken of in the alleged defamatory statements,

and the intent or knowledge of Defendant when the statements were published.

The trial lasted two days, and after hearing evidence from Plaintiff, Plaintiff's expert

witness, and Defendant, the jury rendered a verdict in favor of the Plaintiff.  On each of Counts

One, Two and Three of the Complaint, the jury awarded Plaintiff $24,000 in compensatory, or

actual damages, and $20,000 in punitive damages; as to Count Four, the jury awarded Plaintiff

$24,000 in compensatory damages as well as $24,000 in punitive damages; and on Count Five,

they awarded Plaintiff $24,000 in compensatory damages, and $32,000 in punitive damages.

(Docket No. 63.)  Defendant's post-trial motion seeks, alternatively, judgment as a matter of law

or remittitur that must result in a new trial if the Plaintiff declines to accept the remitted

amount(s).  (Def.'s Post-Trial Mot. "Def.'s Mot." at 1-6.)

## II. <u>Analysis</u>

In his motion, Plaintiff raises numerous issues, including complaints of misconduct by

the Plaintiff before and during trial, as well as errors of the Court in presiding over the

proceedings; and he argues that relief should be granted either in the form of judgment

notwithstanding the verdict or, alternatively, that the respective verdicts should be reduced by the

Court, presumably by remittitur.  (Def.'s Post Trial Mot. at 1-5.)  Plaintiff argues, in response,

that Defendant's claims are without merit, that the verdict was substantiated by the evidence presented, and that conduct by both Plaintiff and the Court were well within the limits permitted by the Federal Rules of Civil Procedure and applicable case law. (Def.'s Mem. in Opp. To Def.'s Post Trial Mot. "Def.'s Mem.")  As each of Defendant's claims require an individual analysis, each shall be addressed in turn.

**A.    Defendant's Motion for Judgment as a Matter of Law and Alternative Motion for Remittitur of the Verdict.**

Construing Defendant's post-trial motion liberally, given his *pro se* status, he essentially asserts that judgment be entered in his favor, as a matter of law; or alternatively, that the awards be reduced by remittitur due to the excessive nature of the jury awards rendered which, if declined by Plaintiff, would necessitate a new trial.  (Pl.'s Mot. at 1-3.)[9]  As each claim involves a separate analysis, individual standards of review apply, and will also be addressed in turn accordingly.

1.    <u>Standards of Review</u>

a.    *Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b)*

Pursuant to the Federal Rules of Civil Procedure, a party who has moved for judgment as a matter of law at trial may, within ten days of the jury being discharged, renew the request for judgment as a matter of law, which may include an alternative request for a new trial.  Fed. R. Civ. P. 50(b).  In ruling on a renewed motion, a court has several options and may: (1) allow judgment on the verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law on the claims.  Fed. R. Civ. P. 50(b)(1)-(3).  It is well established that a "Rule 50(b) motion

---

[9]  The Court notes that in construing Defendant's post-trial motion liberally, Plaintiff was given ample opportunity to address the same issues, as requested by the Court in its February 19 and April 2, 2009 post-trial Orders (Docket Nos. 68 & 74.)

should be granted if a district court determines, without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings." Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir. 1999) (citing White v. County of Newberry, 985 F.2d 168, 172 (4th Cir. 1993)).  More specifically, a renewed motion for judgment of a matter of law is properly granted: "if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." Wheatley v. Wicomico County, Maryland, 390 F.3d 328, 332 (4th Cir. 2004) (citing Singer v. Dungan, 45 F.3d 823, 827 (4th Cir. 1995)).

In addition to the substantive dictates of Rule 50(b), there are procedural requirements that must also be met in order to properly raise such a motion.  Among the requirements is that pursuant to Rule 50(b), in order for the trial court to consider a renewed motion for judgment as a matter of law, the moving party must have also raised the motion for judgment as a matter of law at the close of all the evidence.  See Harrison v. Edison Bros. Apparel Stores, Inc., 151 F.3d 176, 179 (4th Cir. 1998); Smith v. University of North Carolina, 632 F.2d 316, 338-39 (4th Cir. 1980).  However, there are three exceptions to the rule as recognized by this Court's appellate authority, the Fourth Circuit, namely: (1) where there has otherwise been substantial compliance with the rule; (2) where manifest injustice would otherwise occur since the verdict is wholly without legal support; or (3) where the trial judge, in effect, excused the failure to renew the motion.  See Smith, 632 F.2d at 338-39; SunTiger, Inc. v. Scientific Research Funding Group, 9 F. Supp. 2d 601, 604 (E.D. Va. 1998).  These exceptions are based on the general principle that the Federal Rules are to be liberally construed, and for situations where "both the adverse party and the court are aware that the movant continues to believe that the evidence presented does not

present an issue for the jury," the purposes of Rule 50 should generally be found to have been met. Singer, 45 F.3d at 829 (quoting Moore's Federal Practice, ¶ 50.08, at 50-91).

Plaintiff, in his reply brief, correctly notes that Defendant failed to formally raise a Rule 50(a) motion at the close of all evidence. (Tr. 22-23.) Indeed, the Fourth Circuit has noted that the requirement for a properly directed motion at the close of the evidence as a prerequisite for a Rule 50(b) motion "is not a mere technicality", and that "it serves vitally important interests in the fair conduct of litigation." Miller v. Premier Corp., 608 F.2d 973, 980 n.3 (4th Cir. 1979) (citing Virginia-Carolina Tie & Wood Co. v. Dunbar, 106 F.2d 383, 385 (4th Cir. 1939)). However, the Fourth Circuit has also recognized that there are limited exceptions to the rule, as noted, that are necessary to serve the interests of justice and to ensure that all circumstances are fairly considered at the post-trial stage. See Singer, 45 F.3d at 829.

Here, it is clear that the Court effectively excused the Defendant from formally making a Rule 50(a) motion at the close of all the evidence, as the Court had made it clear, both at the close of Plaintiff's evidence, and upon ruling on Plaintiff's motion for a directed verdict at the close of all the evidence, that the matter contained sufficient factual concerns for the jury to consider. (Tr. 182, 223-24.)[10] Specifically, the Court informed the parties that it was aware of Defendant's continued contentions that there was insufficient evidence to sustain the claims against him, and at the close of Plaintiff's evidence, the Court recognized that especially given Defendant's *pro se* status, it accepted Defendants contentions as a proper motion "so that there's no default issue later." (Tr. 182.) As such, it is clear that the spirit of the procedural

---

[10] The Fourth Circuit has recognized that in circumstances where the trial court has indicated that there was a jury issue(s) involved at the close of Plaintiff's evidence, it was proper to review the Rule 50(b) motion, despite failure to comply with the procedural requirements of raising a formal motion at the close of all evidence. See Singer, 45 F.3d at 829 (citing Boynton v. TRW, Inc., 858 F.2d 1178 (6th Cir. 1988)).

requirements were met, as Plaintiff was properly on notice as to Defendant's contentions, and the trial court clearly indicated that it was excusing the procedural formality of renewing the motion at the close of all the evidence.  Therefore, Plaintiff's argument that the Court's consideration of Defendant's Rule 50(b) motion is procedurally barred lacks merit.

### b.     *Remittitur of Damages and New Trial*

Remittitur is a well-established practice that requires a trial court to order a new trial unless the plaintiff accepts the reduction of a jury award that the court has deemed to be excessive.  See Stamathis v. Flying J, Inc., 389 F.3d 429, 438 (4th Cir. 2004); Norfolk Beverage Company, Inc. v. Cho, 259 Va. 348, 353 (2000).  Specifically, the procedure for remittitur allows a trial court to resolve what it concludes to be an excessive verdict by conditioning the granting of a new trial on the plaintiff's rejection of a reduced verdict.  See G.M. Garrett Realty, Inc. v. Century 21 Real Estate Corp., 17 F. App'x 169, 172 (4th Cir. 2001).  Thus, "with remittitur, the Court does not order that the damage award is reduced; instead, the court gives the plaintiff the option of accepting a reduced amount or trying the case over." Id. at 173.

Although there is no specific rule or provision for remittitur in the Federal Rules of Civil Procedure, such determinations are founded on state law principles, and should be ordered in circumstances "when a jury award will result in a miscarriage of justice."  Hughston v. New Home Media, 552 F. Supp. 2d 559, 564-65 (E.D. Va. 2008) (citing Bennett v. Fairfax County, 432 F. Supp. 2d 596, 599 (E.D. Va. 2006)).  However, remittitur is restricted to particular circumstances which have been clearly identified by the controlling state authority, the Virginia Supreme Court:

> A trial court may set aside a verdict because it is excessive if the amount
> awarded shocks the conscience of the court either because it indicated 'the jury
> has been motivated by passion, corruption or prejudice' or 'has misconceived
> or misconstrued the facts or the law,' or because it is so disproportionate 'to the

injuries suffered as to suggest that it is not the product of a fair and impartial decision.'

Government Micro Resources, Inc., et al. v. Jackson, 271 Va. 29, 44 (2006) (citing Shepard v. Capitol Foundry of Virginia, Inc., 262 Va. 715, 720-21 (2001)).  In conducting an analysis involving possible remittitur, a court must consider all of the factors that might have influenced the jury in reaching their verdict, and to consider all evidence in the light most favorable to the prevailing party at trial.  See Fairshter v. American National Red Cross, et al., 322 F. Supp. 2d 646, 658 (E.D. Va. 2004); Government Micro Resources, 271 Va. at 47.  Given the deference that must attend jury verdicts, "[a] trial court will not set aside a verdict either as inadequate or as excessive merely because the court may have awarded a larger or smaller sum had it been the trier of fact."  Stamathis, 389 F.3d at 442; See also Norfolk Beverage Company, Inc. v. Cho, 259 Va. 348, 354 (2000).  If the verdict was impartially rendered and dependent on competent evidence, it shall not be disturbed.  See Fairshter, 322 F. Supp. 2d at 658.

Moreover, in applying the remittitur standard to per se defamation cases, it is clear that the Virginia Supreme Court, as well as federal courts applying Virginia law on the issue, have crafted a narrower view of when remittitur is applicable.  As expounded by the Virginia Supreme Court, the law of defamation historically protects an individual's basic right to "personal security in their uninterrupted entitlement to enjoyment of their reputation," and as such, "'[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation.'"  Gazette, Inc. v. Charlottesville Newspapers, Inc., 229 Va. 1, 7 (1985)(citing Fuller v. Edwards, 180 Va. 191, 197 (1942)).  As to defamation per se, the analysis is extended one step further whereby the false statements necessarily "prejudice [a] person in his or her profession or trade."  Swengler v. ITT Corp. Electro-Optical Products Division, 993 F.2d 1063, 1070 (4th Cir. 1993).  "The critical distinction between defamation per se and other actions for defamation is that a person so

17

defamed is presumed to have suffered general damages, and any absence of actual injury is considered only in diminution of damages." Stamathis, 389 F.3d at 440.  In addition to the presumed damages caused by such statements, a plaintiff may recover, not only for the economic or out-of-pocket damages involved, but also for resulting emotional harm, embarrassment and mental suffering.  See id. at 439.  Thus, in a remittitur determination where *per se* defamation damages are at issue, the plaintiff is not required to prove actual damages, and "even in the absence of any evidence of pecuniary loss, the damages which the injured party is entitled to recover may be substantial." Poulston v. Rock, 251 Va. 254, 261 (1996) (citing Slaughter v. Valleydale Packers, Inc., of Bristol, 198 Va. 339, 348 (1956)).

However, although applicable case law indicates that evidence of actual damages does not have to be demonstrated in *per se* defamation cases, that does not mean that a jury may simply "conjure up" an appropriate verdict without some rational relationship to the underlying facts and circumstances of the case.  The remittitur analysis, though limited in such cases, is still a factual analysis in which the court must examine the evidence presented and its relationship to the amount of damages awarded by the jury.  See e.g., Schnupp v. Smith, 249 Va. 353, 366 (1995); Gazette, Inc., 229 Va. at 48.  Therefore, in analyzing the actual damage award in defamation *per se* cases, this Court will reference the Virginia "shocks the conscious" standard, while also being mindful of the deference given to jury awards which nevertheless can, at times, have an imperceptible basis.

Unlike actual damages, which often compensate for a plaintiff's quantifiable losses, punitive damages have been established to punish a wrongdoer for extraordinary misconduct and to deter others from doing likewise.  See Stamathis, 389 F.3d at 442.  Due to the unique nature of punitive damages, a review of a jury's punitive damages award requires an analysis of both state

and federal law.  See Hughston, 552 F. Supp. 2d at 568.  Specifically, "[i]n reviewing an award

of punitive damages, the role of the district court is to determine whether the jury's verdict is

within the confines set by state law, and to determine, by reference to federal standards

developed under [Federal Rule of Civil Procedure] 59, whether a new trial or remittitur should be

ordered."  Id.

Under Virginia law, there are several factors a court must take into consideration when

determining whether a punitive damages award is proper, including: (1) consideration of the

reasonableness between the damages sustained and the amount of the award; (2) the

measurement of punishment required; (3) whether the award will amount to a double recovery;

(4) the proportionality between the compensatory and punitive damages; and (5) the ability of the

defendant to pay.  Id. at 568; see also Poulston, 251 Va. at 264.  As with actual damages, the

analysis is unique in per se defamation cases, because a court must acknowledge that punitive

damages may be awarded by a jury in circumstances where actual damages were neither found,

nor proven.  See Swengler, 993 F.2d at 1071. However, although punitive damages may be

appropriate in certain cases without there being actual damages, that does not preclude a case

involving punitive damages from remittitur review, as a punitive damages award must still bear

some reasonable relationship to the evidence considered by the jury, and the award must be

founded on clear and convincing evidence that Defendant had acted with malice.  See e.g.,

Stamathis v. Flying J, Inc., 389 F.3d 429 (4th Cir. 2004); Poulston v. Rock, 251 Va. 254 (1996).

     2.     Analysis of the Individual Claims for Judgment as a Matter of Law, or
              Alternatively, Remittitur

        a.    Analysis of Count One Claims

The defamatory statements that are the basis of Count I concern statements reflecting that

Defendant had written to Plaintiff's employer and the Maryland Bar Association Ethics

Committee concerning what he alleged was attorney misconduct, and statements encouraging other members of the Absolute Write website to do the same if they knew of evidence of such conduct by Plaintiff.  (Compl. ¶ ¶ 7-9.) In examining the actual damages awarded to Plaintiff for Count I by the jury, it is clear that the finding itself as to the award of actual damages rests upon an appropriate evidentiary foundation, such that judgment as a matter of law would be improper; however, the damages awarded were substantially beyond the harm allegedly suffered by Plaintiff, and as such, remittitur is appropriate.

The Plaintiff provided sufficient evidence at trial to demonstrate that the Defendant intentionally or negligently posted the statements about Plaintiff.  Specifically, the statements themselves refer to Plaintiff by name, encourage others to act as Defendant had, and, in one posting, Defendant, in effect, taunts Plaintiff to respond to Defendant's allegations.  (Pl.'s Exs. 19 & 20.)  Furthermore, when considered in the context of the circumstances involving the "cease and desist" letter sent to Christine Norris, the statements could be readily construed by a reasonable person as being retaliatory in nature.  (Pl.'s Exs. 13, 15, 17, 19 & 21.)  At trial, when asked about the specific posts, Defendant was asked if he was targeting Plaintiff, to which he responded that: "[Plaintiff] targeted another writer, I just stood up for that writer."  (Tr. 151.) Defendant also testified that he "encouraged [other authors] to send letters or e-mails to the authorities complaining about the treatment of this other writer who was merely trying to (inaudible) the behavior of Publish America [sic]."  (Tr. 153.)  Such statements, along with Defendant's posts on the Absolute Write message board, could easily be inferred to be intentionally or negligently made in an attempt to retaliate against Plaintiff, and as such, judgment as a matter of law is not appropriate.

20

In regard to the Defendant's request for remittitur, however, given the circumstances, venue and context of the statements related to Count I, the actual damages awarded were so excessive as to "shock the conscious" in the sense that, based on the evidence presented, the jury misconstrued the applicable facts and law.  In reviewing the statements alleged as the basis for Count I, it is clear that the most disparaging and defamatory of the comments is the text of the e-mail that was posted by Defendant suggesting that Plaintiff engaged in illegal or unethical conduct in his capacity as an attorney.  The other posts included in Count I presumably intended to garner support for the accusations against Plaintiff, suggesting that Defendant's motive was to retaliate against Plaintiff for his interactions with Christine Norris.  Such statements, considered together, directly compromised Plaintiff's reputation and accountability in his chosen profession, and as such, are defamatory *per se*.  See Union of Needletrades v. Jones, 268 Va. 512, 519 (2004) (quoting Fuste v. Riverside Healthcare Association, Inc., 265 Va. 127, 132 (2003)).

But even given that the statements are defamatory *per se*, and, as such, actual damages are presumed, that does not allow, as previously noted, for a jury verdict beyond what can be reasonably attributed to Plaintiff's actual loss or harm as a result of such statements.  Although there is scant case law directing remittitur of actual damages in *per se* defamation cases, the Virginia Supreme Court, and Fourth Circuit cases adopting Virginia law, have not precluded remittitur in such cases, and thus, this Court concludes, that although unusual, there are situations in which the verdict in a *per se* defamation case does in fact "shock the conscious", making remittitur necessary and appropriate.

The essence of Plaintiff's defamation claims in Count I are based on the comments in the e-mail posted by Defendant which he sent to members of the Maryland State Bar Ethics Committee and to the office e-mail address at Plaintiff's former law firm.  It is important to note

that in Plaintiff's Complaint, however, he did not allege defamation on the basis of the original e-mail that Defendant sent; but instead, simply as to the reproduction of the text of that e-mail on the Absolute Write website.  (Compl. ¶ 8.)  At the same time, though, at trial Plaintiff focused his testimony at trial on the injury he purportedly suffered due to colleagues in his profession reacting to the original e-mail, not the reproduction of it on the Absolute Write website. (Tr. 80, 82.)  While Plaintiff's embarrassment is relevant in regard to the original e-mail comments, it is wholly separate from the embarrassment Plaintiff allegedly suffered due to people reading the reproduction of the e-mail on the Absolute Write website, and such a circumstance must be distinguished from the earlier publication to assess the proper measure of actual damages for Plaintiff's stated claim.  Stated another way, actual damages for the claim should reflect the damage suffered due to accessing the copy of the e-mail, as well as Defendant's comments regarding Plaintiff's being disciplined, on the Absolute Write website.  In that regard, however, Plaintiff failed to present evidence at trial suggesting that he suffered any harm from the members of the small web-based community reading the comments, none of whom he alleged were professional colleagues.  Plaintiff did testify that he suffered some embarrassment from the reproduction of the e-mail, stating that while he "had no problem" with Defendant sending a complaint to the Maryland State Bar, he was embarrassed that Defendant reproduced the e-mail on the internet for others to view more publicly then they would have otherwise been able to access.  (Tr. 82-83.)  While such embarrassment is properly considered, and does merit the award of some damages, the jury award of $24,000 does not properly reflect the distinction between the embarrassment caused to Plaintiff by the original e-mail, which was not at issue in the case, and the more nominal damage caused by the reproduction of the e-mail on the Absolute Write website.

Plaintiff also argues that evidence of actual damages, in addition to the embarrassment suffered by reproduction of the email, included evidence that the posts in Count I were, and still are, easily accessible to anyone on the internet who "Googles"[11] Plaintiff's name.  (Tr. 86-87.)  Specifically, Plaintiff argued at trial that his friends, family and colleagues were able to put his name into the Google search engine, and that these comments would appear, placing Plaintiff in a humiliating light.  (Tr. 86-87.)  Additionally, Plaintiff asserted at trial that he suffered from anxiety that future employers would search for information about him on the internet, and would be able to access the comments, which would at least hinder his prospects for future employment.  (Tr. 78-79.)

In support of this assertion, Plaintiff presented an expert witness who testified that if the comments were discovered by future perspective employers, they could interfere with Plaintiff's employment prospects, because Defendant's comments place Plaintiff's character in a questionable light.  (Tr. 122-23.)  However, in connection with this argument, Plaintiff failed to present evidence, even through his expert, as to how accessible the comments actually are (or would be) for someone searching the internet for information on Plaintiff.  The expert witness testified that he "went on Google" and that he "did some checking . . . on the Absolute Right [sic] website," and that  "based on those things that Mr. Kuzminski had said, the red flag would be waiving very high at a search firm and they would put Mr. Cretella's file aside."  (Tr. 122.)  However, when asked on cross-examination whether he had searched "the rest of the Internet for comments or articles involving Mr. Cretella", the expert stated that he had not conducted that

---

[11]   "Googled" is derived from the verb "to Google" which refers to using the Google search engine to obtain information on the world wide web.  Mirriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/googled (search term: "googled").  In this case, it was used synonymously by the parties as referencing an internet search via the Google search engine as well as conducting any general internet search via any search engine.

type of general search, implying that he only looked at the comments that Plaintiff had asked him to examine, and did not conduct a "Google" search or a general internet search that would actually result in an employer retrieving the comments made by Defendant.[12]  (Tr. 123.)

Similarly, Plaintiff testified that he had friends and family who had searched for his name on the internet and had found the comments made by Defendant.  (Tr. 86-87.)  In support of his assertion, Plaintiff presented an e-mail that was written by one of his friends, which he testified demonstrated that his friend had searched the internet for Plaintiff's name and had found Defendant's comments.  (Tr. 87.)  In fact, close examination of the exhibit does not indicate that the friend's search resulted in the Absolute Write website in question appearing, but instead indicates that the friend located information regarding Plaintiff's suit against Defendant, and that, as the friend stated, he "ended up reading some of the discussion board." (Pl.'s Ex. 11.)  Plaintiff also presented a post by Defendant in which the latter encouraged members of the Absolute Write community to refer to PublishAmerica employees by their full name in their message board postings so that the information posted could be more easily accessible via internet search engines.  (Pl.'s Ex. 42.)  However, the post was made by Defendant in 2005, over a year before Plaintiff had become counsel for PublishAmerica.  (Tr. 77-79.)  Furthermore, as explained by Defendant in his 2005 post, it is unlikely that Plaintiff's friends or family accessed the statements

---

[12]  The Court notes that Defendant was given several opportunities, both before trial and during the expert's testimony to question Mr. Silverman as to his qualifications as an expert witness and the basis of his opinion(s).  At the Final Pretrial Conference, Defendant was further informed that he had the right to question or object to Mr. Silvermans's qualifications as an expert in this field and/or the validity of his opinion(s), but Defendant responded that he preferred for Mr. Silverman to testify.  During the trial, Defendant did not examine Mr. Silverman as to his qualifications or the basis for his opinion(s), and given Defendant's informed, continued rejection of such a line of inquiry, the Court allowed Mr. Silverman to testify, despite concerns arising from the Supreme Court's holding in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  See Order in Final Pretrial Conference, November 17, 2008 (Docket No. 58.)

made in Count I through any internet searches that they conducted, as none of the comments refer to Plaintiff by his full name, rather he is referred to as Mr. Cretella or by his nickname of "Vic", indicating that it would be unlikely that the statements on the Absolute Write website would be found either by friends, family or future employers who "Googled" Plaintiff's full name.

The Court recognizes that the Plaintiff endured personal embarrassment and humiliation in regard to the reproduction of Defendant's ethics complaint against Plaintiff, in addition to the comments encouraging others to do the same; however, given the nuances in the case, including the fact that Plaintiff's Complaint alleged defamation solely for the reproduction of the text of the email on the Absolute Write website, and that Plaintiff spoke generally about, but failed to prove, that the Count I comments were accessed by, or accessible to, more then just the members of the small online community involved, it is clear that the actual damage award is excessive. A review of the evidence thus indicates that the jury misconstrued the actual severity and residual effects of the Count I comments and, therefore, remittitur of the actual damages in Count I to a quarter of what the jury awarded, or $6,000.00, is deemed appropriate. While such a reduction is necessarily arbitrary in the absence of firm ascertainable measure, especially where actual damages are presumed in *per se* defamation claims, the percentage reduction appears appropriate and sufficient to the Count given such circumstances as to the questionable accessibility of the comments, the limited audience likely involved, and the speculative nature of the supposedly expert evidence regarding possible future employment prospects that the Plaintiff had not yet pursued.

In addition to the reduction of the actual damages awarded by the jury, Plaintiff asserts that the Court should also grant judgment as a matter of law for the punitive damages awarded

for Count I; or, alternatively, the Court should remit the amount as being excessive.  In order for

punitive damages to be properly awarded, the Plaintiff must demonstrate by clear and convincing

evidence that the Defendant acted with actual malice.  See Government Micro Resources, 271

Va. at 42.  To establish actual malice, Plaintiff must show that the Defendant "'either knew the

statements he made were false at the time he made them, or that he made them with a reckless

disregard for their truth.'"  Id. (quoting Ingles v. Dively, 246 Va. 244, 253 (1993)).

As discussed earlier, the nature of the statements alone, particularly when coupled with

Defendant's testimony as to his intent, are sufficient to establish that punitive damages were

properly awarded.  The statements in Count I are taunting and vindictive, and as Defendant

testified, they were generated as a direct response to what he believed to be an attack on another

author.  (Tr. 151.)  These "reactionary" statements posted on the message board accuse Plaintiff

not only of unethical conduct, but also of illegal acts.  Although the Defendant stated in one of

his posts that he had information substantiating the claims, Defendant did not present such

evidence at trial, thus leaving the jury with the reasonable inference that the allegations against

Plaintiff were based on speculation alone.  Furthermore, the Plaintiff presented significant

evidence that Defendant's statements were made with a vindictive intent.  Indeed, the evidence

presented confirms that shortly after posting the copy of the e-mail sent to the Maryland Ethics

Committee, Defendant actively encouraged others to do the same.  (Tr. 153; Pl.'s Ex. 19.)

Moreover, after posting the text of the e-mail, Defendant wrote on the message board: "Well,

let's see Vic deal with this . . . Yes, this just went out in email.  They want to play rough, then

let's level the playing field just a bit."  (Pl.'s Ex. 19) (emphasis in original).  The clearly

acrimonious sentiment, accompanied by the serious professional allegations against Plaintiff, and

the "call to arms" instigated by Defendant, are sufficient to establish that the postings in Count I

were made with actual malice.  At the same time, however, and as previously discussed, an award of punitive damages must still bear some relationship to the harm inflected, based on consideration of all the circumstances involved; where, otherwise, it would appear to merely constitute double recovery, or be vindictive in its own sense that would detract from whatever deterrent effect was intended.  Accordingly, a quarter percent recovery (or seventy five percent reduction) to $5,000.00, commensurate with the reduction of the actual damage award, appears appropriate.  The Defendant's motion for a new trial, in that regard, will therefore be conditionally denied, subject to Plaintiff's acceptance or rejection of the remitted damage amounts.

### b.    Analysis of Count Two Claims

The alleged defamatory statements in Count II are web postings by Defendant on the Absolute Write website in which he attempts to explain Plaintiff's professional transition from his former law firm to in-house counsel at PublishAmerica.  (Pl.'s Ex. 22.)  In the comments, Defendant speculates as to "how much embarrassment" Plaintiff caused the law firm while employed with the firm, and states that Plaintiff "might be just that much closer to losing his license" now that his former law firm is not "vouching" for him.  (Pl.'s Ex. 22; Compl. ¶ 10.)  In his post-trial motion, Defendant requests renewed judgment as a matter of law, or, alternatively, remittitur of both the actual and punitive damages awarded by the jury.

Defendant's renewed motion for judgment as a matter of law is without merit, as a review of the Record demonstrates that Plaintiff provided sufficient evidence at trial demonstrating that Defendant intentionally or negligently posted the statements about Plaintiff.  The Count II statements, particularly when read in light of Defendant's continuous postings regarding Plaintiff's employment status, could be reasonably interpreted by a jury as a campaign by the

Defendant to specifically "target" Plaintiff.  At trial, Defendant stated that he believed in

"targeting" the employees of PublishAmerica in order to expose what he believed to be their

misconduct in the publishing industry.  (Tr. 137, 140-41, 143.)  Specifically, when asked at trial

if he wanted to target the employees of PublishAmerica, Defendant responded by stating

"[t]hat's how you go about getting rid of the gang.  You target the members of it."  Additionally,

in explaining why he believed that his ethics complaints to the Maryland Bar would have caused

Plaintiff to change careers, Plaintiff stated that when he initially reported Plaintiff, "the most [he]

thought would happen would [be for Plaintiff to] get a reprimand from his boss", but that when

he realized that his actions might have something to do with Plaintiff's employment transition,

"it was icing on the cake because [he] didn't think [he] had done anything more than maybe get

[Plaintiff] a reprimand."  (Tr. 154.)  However, despite his personal belief and/or excitement at

the prospect that his actions resulted in the change in Plaintiff's employment, Defendant

admitted at trial that he was never contacted by the Bar Association, or aware that any

investigation was undertaken, based on his input.  (Tr. 134-35.)

In addition to the testimony by Defendant about his general contempt against all

PublishAmerica employees, Plaintiff presented several exhibits of postings by Defendant in

which Defendant's personal animosity towards Plaintiff was evident.  (Tr. 143-44, 156, 167-68.)

In displaying one such post to the jury, Plaintiff's counsel asked Defendant about one of his web

postings in which he wrote: "Heck, we might even convince the FBI to suggest to Cheney that he

invite Victor out for some hunting."  (Tr. 144, Pl.'s Ex. 25.)  When asked whether the comment

was directed towards Plaintiff, Defendant testified that it was, and that he had been referring to

the incident where former Vice President Cheney "had a habit of shooting lawyers while they

were hunting."  (Tr. 144.)  Defendant followed up by stating: "[a]t least we had some good use

28

of Cheney while he was in office." (Tr. 144.) Furthermore, Plaintiff submitted several exhibits in which Defendant had continually taunted the Plaintiff which readily demonstrated that Defendant harbored contempt for the Plaintiff. (Pl.'s Ex. 7, 24, 25, 37, 38.) Such postings, taken together, demonstrate a basis for finding that Plaintiff's Count II comments were made intentionally or negligently, and thus, Plaintiff's renewed judgment as a matter of law must be denied as to Count II.

In analyzing Defendant's alternative request for remittitur, the Court finds, as with the Count I claim, that given the circumstances, venue and context of the statements in Count II, the actual damages awarded were so excessive as to "shock the conscious", indicating, based on the presentation of the evidence, that the jury misconstrued the applicable facts and law. As with Count I, the statements in Count II compromise Plaintiff's reputation and accountability as an attorney, and as such, are defamatory *per se*. Specifically, Defendant's statements suggest that Plaintiff was an incompetent attorney, causing embarrassment to his employer, and that Plaintiff was in danger of losing his professional license. Obviously, such statements directly and adversely affected Plaintiff's reputation as a professional. See Cretella v. Kuzminski, No. 3:08cv109, 2008 WL 2227605, at * 8 (E.D. Va. May 29, 2008); see also Carwile v. Richmond Newspapers, 196 Va. 1, 7-8 (1954). However, as discussed in conjunction with Count I, although actual damages are presumed for *per se* defamatory statements, such a standard does not allow for an award beyond what can be reasonably attributed, at least to some foreseeable extent, to Plaintiff's actual loss or harm as a result of the statements.

As with the Count I claims, Plaintiff testified that the statements by Defendant regarding the reasons behind Plaintiff's change in employment embarrassed him, and caused him anxiety for fear that his friends or family would gain access to the statements on the internet. (Tr. 84, 86-

87.)  While such embarrassment is plausible, and no evidence was necessary to establish that

such harm had been caused to Plaintiff, the jury's actual damages award of $24,000 for actual

damages as to the Count II comments does not rationally relate to the speculative and otherwise

innocuous damage actually inflicted on Plaintiff.  As discussed earlier, the Plaintiff did not

contest that the Absolute Write website was a relatively small online forum, and he provided no

substantive evidence demonstrating that anyone had actually discovered the Count II statements

via an on-line internet search.  While Plaintiff's actual damages should account for his professed

anxiety, the award must also reflect that no tangible harm was caused by documented incidents

of the posts being accessed by friends or family without them having been specifically directed

to the postings.

Furthermore, Plaintiff testified that the statements adversely impacted on his job search

when he had decided to leave the law firm in early 2007, and presented expert testimony that

these statements would harm any future attempts to secure other legal employment.  (Tr. 86, 122-

23.)  In reviewing the actual damages claims, the Court notes that the statements in Count II

were made on May 4, 2007, several months *after* Plaintiff had already decided to accept the in-

house counsel position with PublishAmerica.  (Pl.'s Ex. 22; Tr. 77-80.)  Thus, the actual

damages awarded must be based solely on the prospective harm that the comments would have

on Plaintiff if he sought different employment in the future upon vacating his position at

PublishAmerica.

As with the damages issue related to Count I, Plaintiff presented the testimony of Arnold

D. Silverman, a professed expert witness in the general area of employment issues.  (Tr. 115-16.)

In his testimony, Mr. Silverman explained what types of factors employers look for when they

are determining which applicants to interview and subsequently hire, without delineating the

precise process undertaken by most law firms or legal institutions.  (Tr. 118-20.)  Mr. Silverman also explained the process he employed in analyzing Plaintiff's particular situation, and the effect Defendant's comments could have on Plaintiff's career plans.  (Tr. at 120-22.)  Mr. Silverman testified that he reviewed summations of the Court proceedings, as well as comments, letters and statements made by Mr. Kuzminski regarding Plaintiff and PublishAmerica.  (Tr. 121.)  He testified that he also engaged in some research of his own, by utilizing "Google" and "checking . . . on the Absolute Right website" where he testified that he "found a full number of situations on that website in which Mr. Kuzminski made comments."  (Tr. 122.)  Based on his research, Mr. Silverman concluded that Defendant's comments would raise a "red flag" on any applications or résumé Plaintiff would forward to future potential employers and would thereby adversely impact Plaintiff's employment opportunities in the future.  (Tr. 122-23.)

While there may be some merit to Mr. Silverman's conclusions, a closer examination of his testimony and process he utilized demonstrate several concerns that would have confused, and potentially misled, the jury as to the value of his conclusions.  First, Mr. Silverman failed to delineate the hiring process generally for a law firm, and more specifically, a law firm that would be seeking to hire a candidate such as Plaintiff who would have at least five to ten years of legal experience.  (Tr. 118.)  Furthermore, Mr. Silverman failed to testify to the likelihood of a future employer finding the comments made by Defendant, particularly in light of the fact that in most of the web postings, Plaintiff is referred to as simply "Vic", or some other short version of his name.  Additionally, Mr. Silverman testified that he did not conduct a general internet search beyond the websites that were provided to him by Plaintiff, and thus, the effects of a general "Google" search, that Plaintiff's counsel reiterated several times would be damaging to Plaintiff, was unsubstantiated by the expert witness's testimony.  (Tr. 123.)

31

The Court recognizes the Plaintiff's legitimate concerns regarding his personal embarrassment and anxiety in the statements potentially being found; however, given the fact that Plaintiff failed to produce evidence of discovery of the Count II comments by employers, colleagues or friends and family, and additionally failed to provide evidence as to the actual accessibility of the comments via an internet search engine, it is clear that the actual damage award is excessive.  A review of the evidence indicates that the jury misconstrued the actual severity and residual effects of the Count II comments; thus, remittitur of the actual damage award in Count II by the same percentage (75%) amount as applies to Count I, resulting in an adjusted amount of $6,000.00, is deemed appropriate.

In addition to the reduction of actual damages, Plaintiff asserts, as with all the Counts, that the Court should also grant judgment as a matter of law for the punitive damages awarded for Count II; or alternatively, the Court should remit the amount awarded as excessive.  As discussed earlier, in order for punitive damages to be properly awarded, the Plaintiff must demonstrate by clear and convincing evidence that the Defendant acted with actual malice, either by showing that the Defendant "'either knew the statements he made were false at the time he made them, or that he made them with a reckless disregard for their truth.'"  See Government Micro Resources, 271 Va. at 42.  The nature of the Count II statements, particularly when coupled with Defendant's testimony regarding his contempt for Plaintiff and the postings where he, in effect, taunts Plaintiff, establishes clear and convincing evidence of Plaintiff's malicious intent to injure or cause embarrassment to Plaintiff.  However, upon review of the statements, particularly when analyzed in the context of the significance and purpose with which Virginia law views punitive damage awards, it is clear that the $20,000.00 awarded in punitive damages as to Count II is also excessive.

Punitive damages have been authorized under Virginia law to be awarded for the purpose of punishing the wrongdoer for extraordinary misconduct and to warn others against doing the same. See Stamathis, 389 F.3d at 442. A federal district court reviews punitive damage awards by applying the state substantive law of punitive damages under standards imposed by federal procedural law, in order to determine whether a jury's verdict is within the confines established by state law, and by referencing the federal standards developed in regard to Federal Rule of Civil Procedure 59. Atlas Food Systems, 99 F.3d at 593. While juries are "authorized to award punitive damages on a framework of liability and factors supplied by state law, the judgment a jury makes as to the *amount* is reviewable by federal trial courts under Federal Rule of Civil Procedure 59 less deferentially than are factual findings which may be measured against the factual record." Id. at 595 (emphasis in original). The Fourth Circuit has held that district courts are often more well equipped to make such determinations, given the relative inexperience of juries in making such "sentencing" determinations.[13] See id. at 594. Thus, a "court's review of the amount of a punitive damages award should involve comparison of the court's independent judgment on the appropriate amount with the jury's award to determine whether the jury's award is so excessive as to work an injustice." Id. In reviewing whether an award of punitive damages is excessive and subject to remittiur, a court must consider several factors, including the

---

[13] "[W]hen reviewing the amount of a jury's punitive damages award under Federal Rule of Civil Procedure 59, the district court has a participatory decision making role that it does not have when reviewing a a jury's findings based solely on facts. Because the jury's determination of the amount of such an award is almost entirely ungrounded in the factual record, a court cannot generally test the amount amount of a punitive damage award against record facts to conclude whether, for example, a jury's $10 million award or $1 million award is the correct one. And a jury, which is called upon to make that 'sentencing' type of judgment only in the single case before it, is relatively ill-equipped to do so. On the other hand, the district courts not only see punitive damage awards daily, but themselves are required frequently to impose penalties for punishment and deterrence in a wide array of circumstances, both in civil and in criminal contexts." Atlas Food Systems, 99 F.3d at 594.

"reasonableness between the damages sustained and the amount of the award and measurement of punishment required, whether the award will amount to a double recovery, the proportionality between the compensatory and punitive damages, and the ability of the defendant to pay." Poulston, 251 Va. at 263.  A slight adjustment is made to the review in the case of statements which are defamatory *per se*, as it is well established that punitive damages can be awarded in such a case where actual damages have not been proven, let alone awarded.  See id. at 264.

The punitive damages awarded for the claim in Count II are so excessive as to unjustly punish the Defendant for his actions in posting the statements to the Absolute Write website.  As noted earlier in regard to Count I, the statements were made in a relatively small venue, to a group of authors, many of whom had also expressed some ill will towards either Plaintiff or PublishAmerica generally.  (Pl.'s Ex. 22.)  Specifically, one person on the discussion board even attached a photo of Plaintiff on the website and encouraged any author who may encounter Plaintiff at a hearing to wear a t-shirt with Plaintiff's picture on it as a way to fluster or embarrass him.  (Pl.'s Ex. 22.)  Similarly, several writers bantered about Plaintiff's positions and credentials in the same discussion "thread."  (Pl.'s Ex. 22.)  The group of writers and web-posters would have been less affected by Defendant's postings then a group of unknowledgeable viewers who were not familiar with the continued dialogue and banter regarding PublishAmerica and Plaintiff on the Absolute Write website.  (e.g. Pl.'s Exs. 13-34.)  Furthermore, anyone who were to access this website, particularly the lengthy discussions regarding Plaintiff and PublishAmerica, were less likely to single out Defendant's comments as being the most significant, but would likely draw inferences from the comments and discussion as a whole. While Defendant's comments do tend to "stand out" as being accusatory, they are not so

distinctive as compared to the mainstream discussion on the website to be considered as the sole influence on a person who may access the discussion board.

In addition to the limited effect of Defendant's comments on an outside reader, no evidence was presented at trial demonstrating that the comments were accessed by, or accessible to, a person who conducts a web-search of Plaintiff's name.  Plaintiff testified that he feared that the comments would be found, but neither Plaintiff nor his expert witness testified, or presented evidence of the actual likelihood that such would occur.  Again, as noted previously, the point is particularly important when discussing the venue in which Defendant made his statements, as the internet is an ever-changing and otherwise ineffable creature, and the likelihood of finding specific information can vary at any particular time.  Although such circumstance applies primarily to the award of actual damages, it is also relevant in considering the appropriate "punishment" of Defendant for his comments as it involves not only the potential harm he caused, but the potential harm that Defendant could have possibly intended to cause.  Given the nature of the statements, which can be best characterized as negative banter which was "taken too far," and given the cumulative harm resulting and the atmosphere in which the statements were made, Defendants motion for a new trial will be denied conditionally upon Plaintiff's acceptance of a reduced punitive damage award in the resulting amount of $5,000.00 (by the same percentage as the actual damages award), consistent with the amount and rationale of the remitted award of punitive damages related to Count I.

       c.     *Analysis of Count Three Claims*

Plaintiff's third defamation claim is based on two web posts by Defendant made in May and July of 2007.  The first web post was made on The Guild website discussion board, and in response to comments, questions and several derogatory remarks regarding Plaintiff's decision to

accept an in-house position at PublishAmerica.  (Pl.'s Ex. 35.)  In explaining why he believed

Plaintiff had taken the position, Defendant posted:

> Well before Vic's professional move, he was targeting a writer who frequents
> another board.  In response, a number of writers sent emails to various
> lawyers in Maryland who look over ethics among Md layers and such.  I also
> sent emails to over twenty such lawyers and included the law firm that Vic
> worked for at the time.  I suspect his sudden change in employment might
> have been due to the backlash against his attempt to attack that writer.  In
> other words, he'd been representing PA for a number of years now without
> any problems.  There's no other readily apparent reason for such a dramatic
> employment change.

In his second statement, which Defendant posted on the Absolute Write website on July 10,

2007, he entered into a dialogue that began with one author commenting on Plaintiff's adherence

to certain arbitration provisions in her publishing contract, to which Defendant responded:

"Seems to me ole Vic is demonstrating why he's no longer with his former firm.  I guess

socializing only goes so far, doesn't it Vic?  Somewhere along the line you actually have to

produce".  (Pl.'s Ex. 35.)

Defendant's statements, which speak directly to Plaintiff's capabilities as an adequate

representative, and his capacity generally as an attorney, tend to compromise Plaintiff's

reputation and accountability as an attorney, and thus are defamatory *per se*.  See Carwile, 196

Va. at 7-8.  The jury awarded Plaintiff $24,000.00 in actual damages and $20,000.00 in punitive

damages, as they also did in regard to Counts I and II.  Defendant requests, again, judgment as a

matter of law, or, alternatively, remittitur of the damages awarded.

Defendant's request for judgment as a matter of law for the actual damages awarded on

Count III is without merit, as Plaintiff clearly established that the Defendant intentionally or

negligently posted the comments on the two internet discussion boards.  Specifically, as

discussed in regard to the Count II claim, the totality of the evidence was such that a reasonable

jury could have inferred that the comments were part of an on-going "attack" on Plaintiff, via the Absolute Write website and the Guild Website, in an effort to retaliate against Plaintiff for his conduct involving other authors.  Such a reasonable inference is substantiated by the numerous statements posted by Defendant in 2007 (after the Christine Norris incident) in which he commented on Plaintiff's professionalism, and, in effect, taunted Plaintiff personally.  (Pl.'s Exs. 7, 19, 21, 22, 35, 36, 38.)  Furthermore, Defendant testified at trial to his on-going dislike of all PublishAmerica employees, whom he felt were perpetuating a harmful scheme involving unwitting authors, and particularly his contempt for Plaintiff.  Such testimony, when considered in light of Defendants numerous web postings about Plaintiff, was sufficient to properly establish a claim of defamation.

As the statements are defamatory *per se*, actual damages are presumed; however, as noted in regard to the first two claims, limitations nevertheless exist as to the parameters of a jury award beyond that reasonably attributed to the tangible as well as emotional harm caused to a plaintiff.  Here, it is clear that actual damages were properly awarded for the claim to compensate Plaintiff for the embarrassment, humiliation and anxiety caused by the statements.  Such is particularly true given Plaintiff's anxiety of the future harm the statements may have on any decision of his to seek other employment.  However, although some harm was demonstrated, the tangible evidence of such harm is limited, speculative, and was misconceived by the jury for essentially the same reasons as apply to the claims in Counts I and II, such that the actual damage award of $24,000.00 must be remitted.

Plaintiff could not have suffered harm during his 2007 job search from the statements as they were both generated several months after Plaintiff had already accepted the in-house counsel position with PublishAmerica.  Furthermore, while Plaintiff presented testimony by the

expert witness that Defendant's comments would have negative hiring implications if the Plaintiff sought future employment after a period with PublishAmerica, the opinions were unsubstantiated by any evidence demonstrating the likelihood that such statements would ever be reviewed, particularly where neither statement contains Plaintiff's full name, but only refers to him as "Vic." The errors and gaps in the expert's testimony, as previously discussed herein, were likely misconceived by the jury, due to the Plaintiff's counsel's continued insistence during trial that the comments were easily accessible by Google, although no evidence was presented to substantiate the assertion. (Tr. 49-50, 248.) Again, the insufficiency in this regard in Plaintiff's evidence is particularly important, given the ineffable nature of the internet, whose content is constantly changing, and where a search for "Victor Cretella" is unlikely to yield results that include comments that simply refer to a person named "Vic." Indeed, as noted earlier, the only evidence Plaintiff presented to substantiate his theory of damages was an internet posting by Defendant in 2005, two years before the comments at issue were made, stating that in order for a Google search to produce the negative comments about PublishAmerica employees, the "poster" would need to include the full name of the person they were referencing. Here, based on Plaintiff's own evidence, it is unlikely that the statements in question would be retrievable at some speculative time in the future if Plaintiff chose to seek other employment, and if they were retrieved, it is unlikely that they would necessarily be associated with Plaintiff. As such, evidence beyond Plaintiff's personal humiliation and anxiety is limited, and a review of the evidence and testimony presented at trial demonstrates the jury's confusion and misconception of the harm suffered by Plaintiff, resulting in an excessive award. Thus, Defendant's motion for a new trial on the issue of actual damages for Count III shall be conditionally denied, depending on whether Plaintiff accepts a remitted damages award of $6,000.00, as with Counts I and II.

In addition to remittitur of the actual damages, and consistent with his other requests for post-trial relief, Defendant requests judgment as a matter of law or, alternatively, remittitur of the $20,000.00 in punitive damages awarded or a new trial for the same claim.  As discussed earlier, the nature of the Count III statements, particularly when analyzed in conjunction with Defendant's testimony regarding his contempt for Plaintiff and the additional web postings where Defendant, in effect, mocks and taunts Plaintiff, are enough to establish by clear and convincing evidence that Plaintiff maliciously intended to injure Plaintiff and cause him embarrassment.  However, again, a review the statements in light of the forum(s) in which they were made, and the applicable Virginia punitive damages standard, results in the conclusion that the $20,000.00 awarded in punitive damages was excessive.

As discussed earlier, punitive damages have been authorized under Virginia law to be awarded for the purpose of punishing the wrongdoer for extraordinary misconduct, and to warn others against the same conduct.  See Stamathis, 389 F.3d at 442.  In addition, while juries are "authorized to award punitive damages on a framework of liability and factors supplied by state law, the judgment a jury makes as to the *amount* is reviewable by federal trial courts under Federal Rule of Civil Procedure 59 less deferentially than are factual findings which may be measured against the factual record."  Atlas Food Systems, 99 F.3d at 595 (emphasis in original).  Thus, a "court's review of the amount of a punitive damages award should involve comparison of the court's independent judgment on the appropriate amount with the jury's award to determine whether the jury's award is so excessive as to work an injustice."  Id.

Here, the punitive damages awarded for this claim are so excessive as to unjustly punish the Defendant for his actions in posting the comments on the Absolute Write and Guild websites. Again, the statements were made in relatively small venues to groups of authors who also

expressed ill will towards either Plaintiff, or PublishAmerica generally.  (Pl.'s Ex. 3, 35.)

Specifically, several of the posters on the website bantered about Plaintiff, his ability to

effectively perform his job, and expressed discontent with PublishAmerica's tactics and

publishing policies.  (Pl.'s Ex. 3, 35.)  As with the other claims, the likely audience of

Defendant's posts, who appear to have also been writers and website participants, would have

been less affected by Defendant's postings then a group of unknown viewers who were not

familiar with the continued dialogue regarding Plaintiff and PublishAmerica.  Furthermore,

anyone who were to access the websites, particularly the lengthy discussions regarding Plaintiff

and PublishAmerica, would be less likely to single out Defendant's comments as being the most

significant, but would likely draw inferences from the comments and discussion as a whole.

While Defendant's comments were negative and accusatory, they are, again, not so

distinguishable from the mainstream discussion on the websites to be considered as the sole, or

even necessarily primary, influence on anyone accessing them.

In addition, as previously noted, in addition to the limited effect of Defendant's

comments on an "outside" reader, no evidence was presented at trial demonstrating that the

comments were accessed by, or accessible to, a person who would conduct a web-search of

Plaintiff's name.  Plaintiff testified that he feared that these comments would be found, but

neither Plaintiff nor his expert witness testified or presented evidence of the actual likelihood that

such would occur.  As with the other claims, it is particularly important when discussing the

venue in which Defendant made his statements to understand that the internet is an ever-

changing and otherwise ineffable creature, and the likelihood of finding specific information can

and does change at any particular juncture.  Although such a circumstance is directly relevant to

the award of actual damages, it also has some relevance in considering the appropriate

"punishment" of Defendant for his comments as it applies not only to the potential harm caused, but the potential harm that Defendant could have intended to cause.  Given the nature of the statements, which, again, can be best characterized as negative banter taken too far, and given the cumulative harm of the venue and the atmosphere in which the statements were made, Defendants demand for a new trial will be granted if Plaintiff denies to accept a remitted portion of punitive damages for the claim in the amount of $5,000.00, consistent with the remitted claims of the previous counts.

> d.      *Analysis of Count Four Claims*

Plaintiff's fourth defamation claim is based on a web post by Defendant on the website, Preditors & Editors, that he intended to be used to provide information concerning different publishing companies, agents, and the publishing industry in general.  (Pl.'s Ex. 1.)  On July 14, 2007, Defendant published a small article on the website which began: "PublishAmerica lawyer Victor Cretella infringing contract?", and which went on to state that Defendant had received information from a "source," indicating that Plaintiff was breaching a provision in a contract clause that governed arbitration proceedings.  (Pl.'s Ex. 1.)  The statement, which addressed Plaintiff's conduct in his capacity as PublishAmerica's counsel, tended to compromise Plaintiff's reputation and accountability as an attorney, and as such was defamatory *per se*.  See Cretella v. Kuzminski, No. 3:08cv109, 2008 WL 2227605, at *8 (E.D. Va. May 29, 2008); see also Carwile, 196 Va. at 7-8.  At trial, the jury awarded Plaintiff $24,000 in actual damages, and $24,000 in punitive damages, the later being a different and higher amount than awarded in relation to the first three claims as punitive damages.  Again, Defendant requests judgment as a matter of law, or alternatively, remittitur, or presumably a new trial as would necessarily result from any grant of remittitur if Plaintiff declines to accept same.

As to the actual damages, judgment as a matter of law is not appropriate, as Plaintiff established that Defendant intentionally or negligently posted the comment on his Preditors & Editors website.  Specifically, Defendant testified at trial that he posted the information on his website for others to read because it was considered "news" at the time.  (Tr. 173.)  Defendant did acknowledge that after he reported this information on his website, the PublishAmerica author who made the accusations against Plaintiff lost her arbitration claims – but Defendant never reported that information or deleted his post regarding the Plaintiff's alleged misconduct. (Tr. 172-73.)  Furthermore, the post itself does not disclose any supporting evidence or information concerning the accusations, but it simply reflects that the information was purportedly received by a "source", without providing any detail or information which fairly presents the basis of the strong, and potentially damaging, accusation.  (Pl.'s Ex. 1.)  Such is enough to demonstrate that the Plaintiff negligently posted the accusation against Plaintiff, and particularly when combined with the fact that the statement was never withdrawn or clarified on the website, there was sufficient evidence presented supporting Plaintiff's claim such that judgment as a matter of law is inappropriate as to the actual damages awarded by the jury.

As Defendant's statement(s) alleging that Plaintiff infringed on contracts is defamatory *per se*, actual damages are presumed, and do not require that the Plaintiff prove tangible damages beyond his own emotional harm.  However, as discussed previously, and repeatedly, the actual damages awarded must have some rational relationship to the actual harm caused by the statements at issue in the case to insure that the jury did not conjure an actual damage award that surpassed the scope and purpose of awarding actual damages generally.

As discussed, actual damages exist as to the claim for embarrassment, humiliation and anxiety caused by the statement; and particularly for the anxiety that it might have been accessed

by friends, colleagues, or future employers.  However, the evidence and personal testimony of

the Plaintiff in that regard are in fact limited, speculative, and it appears they were misconceived

by the jury, such that the actual damage award of $24,000 should also be remitted.  There was no

harm to Plaintiff's immediate employment quest in 2007, as the statement was made several

months after Plaintiff made his employment transition.  Similarly, while Plaintiff's expert

witness testified that the comment could have negative hiring implications if Plaintiff chose to

seek other employment in the future, his testimony was unsubstantiated by any evidence that

demonstrated the reasonable likelihood that the statement would ever be retrieved by any future

employer prospect.  The insufficiency of the expert witness' testimony was likely misconceived

by the jury, given Plaintiff's continued insistence during trial that the comments were *easily*

accessible by Google, although no evidence was offered to substantiate the assertion.  The expert

did not speak to the character of the internet, as previously discussed herein, or the likelihood

that the information in the post would be available to someone searching the internet in five

years, versus, say, twenty years hence.  It is also too speculative to conjure whether Plaintiff will

ever seek employment beyond PublishAmerica, and if so, what information will be available via

a Google or other internet search at that juncture.  As such, reliance on the expert's testimony is

insufficient to justify such an award as granted by the jury.

What evidence Plaintiff did present of internet searches of his name and the results was

either by his own testimony, and based on one e-mail that did not include what comments were

accessed, or whether they were actually found as the result of a reliable internet search, or

whether the information was specifically sought upon knowledge of this case.  Given the

speculative nature of the evidence presented at trial, damages awarded beyond Plaintiff's

personal humiliation and anxiety is limited.  Thus, a new trial on the issue of actual damages

shall be conditionally denied, if Plaintiff accepts the remitted award in actual damages in the amount $6,000.00 for Count IV, consistent with the same percentage reduction, and based on the same rationale, as the Court has applied to the first three counts.

In addition to remittitur of the actual damages, Defendant again requests judgment as a matter of law, remittitur or a new trial, as to the punitive damage award of $24,000.  As noted, to establish actual malice, as a necessary basis for the award of punitive damages, a plaintiff must show that the Defendant "either knew that the statements he made were false at the time he made them, or that he made them with reckless disregard for their truth."  Id.  In *per se* defamation cases, actual malice is not automatically established, based on the nature of the claim, but a plaintiff is nevertheless required to present additional facts or information evidencing defendant's malicious intent to support an award for punitive damages.  See Swengler v. ITT Corp. Elctro-Optical Products Div., 993 F.2d 1063, 1071 n.5 (4th Cir. 1993).

Here, contrary to the earlier claims, Plaintiff failed to prove at trial that Plaintiff posted the statement related to Count IV with a malicious intent.  The statement itself cannot be interpreted as inherently malicious, as the only statement involving Plaintiff is contained in the first sentence, which *questions* whether Plaintiff has infringed on a contract.  (Pl.'s Ex. 1.) The Defendant goes on to claim that the information has been received from a "source," and then he discusses how PublishAmerica conducts their business.  (Pl.'s Ex. 1.)  Such language, alone, is not enough to demonstrate that the comment was made with actual malice.

Moreover, contextually, the statement, unlike the others, was posted on the Preditors & Editors website, and was by itself, not in the context of an ongoing discussion about Plaintiff; nor was it part of an on-line discussion forum, as were the posts on the Absolute Write website. (Pl.'s Ex. 1.)  Indeed, the particular posting, as well as the other portions of the Preditors &

Editors website that were presented at trial, are focused almost entirely on discouraging authors from engaging in business with PublishAmerica, and the entries rarely mention Plaintiff directly or indirectly.  (Pl.'s Ex. 1, 2.)  When questioned on the post at trial, Defendant testified that he had reported it based on information that he had received, and that he believed it constituted "news".  (Tr. 171.)  Defendant also testified that he would not normally post items on the Preditors & Editors website unless he had received an "e-mail and appropriate documentation."  (Tr. 171.)  While Plaintiff questioned Defendant as to the history surrounding the post, and the ultimate outcome of the underlying contract/arbitration dispute, Plaintiff failed to present any evidence contradicting the Defendant's testimony that he believed the information in his post to be accurate, and otherwise newsworthy for fellow authors.  (Tr. 169-73.)  Furthermore, as Plaintiff's counsel spent very limited time examining Defendant on the post, and the post was otherwise infrequently mentioned throughout the trial proceedings, it would be difficult for a jury to surmise that Defendant made the statement with any intent beyond that which he testified. Finding that Plaintiff failed to present clear and convincing evidence of Defendant's malicious intent in posting the statement in Count IV, Plaintiff's motion for judgment as a matter of law as to the punitive damages awarded in Count IV will be granted.

> ### e. *Analysis of Count Five Claims*

Count V includes one statement by Defendant posted on the Absolute Write message board on November 17, 2007, in which Defendant wrote: "Vic had to leave his former employer after a certain party contacted the entire Ethics Committee for the Maryland State Bar Association along with his employers after an attempt by Vic to extort payment to PA from an AW writer who expressed her opinion about PA on the AW website."  (Compl. ¶ 14; Pl.'s Ex. 36.)  The comment, guised in an especially gloating format, clearly attacks Plaintiff's capabilities

as an attorney and his moral character, thereby damaging his reputation and character as an attorney, and as such, is defamatory *per se*. At trial, the jury awarded $24,000 in actual damages and $32,000 in punitive damages for this claim, again higher, at least as to punitive damages, than the awards as to the other claims. Defendant again requests renewed judgment as a matter of law, or, alternatively, remittitur of both the actual and punitive damages, or a new trial. A review of the trial records results in the conclusion that the jury's findings are based upon an appropriate evidentiary foundation, where judgment as a matter of law would be inappropriate; however, the actual damages awarded are, again, deemed beyond the harm allegedly suffered by Plaintiff, and as such, remittitur is appropriate.

There was sufficient evidence at trial to demonstrate that Defendant intentionally or negligently posted the statement. The comment was posted by Defendant in November 2007, and is a culmination of many previous statements made by Defendant in which he, in effect, baits Plaintiff and continually tries to convince others that Plaintiff was discharged from his position at the law firm because of ethical, or even criminal violations. Defendant does not speculate at this junction as to why Plaintiff was fired, but directly attributes it to his own complaints to the Maryland Bar Association. (Pl.'s Ex. 36.) At trial, Defendant testified that he was aware that Plaintiff's biographical information was still listed on the law firm's website, but that he believed that was just the law firm's attempt not to depict Plaintiff's departure as being adverse. (Tr. 161.) Defendant further testified that he believed that it wasn't natural for an attorney to go work in-house for one of their clients, particularly one with, in his opinion, such a bad reputation – but that he did not have, admittedly, any supporting evidence for his assertion. (Tr. 163-66.) Indeed, Defendant, when asked whether or not he "ha[d] any consideration to Mr. Cretella's career and how this information might affect his career" before he posted this comment, Plaintiff answered

"No."  (Tr. 166.)  The comment does appear even more vindictive and snide than his previous postings, and presumably motivated the jury to render a higher award for punitive damages. Such testimony, in conjunction with Defendant's continuous barrage of web postings regarding Plaintiff, the Plaintiff's position at PublishAmerica, and the speculation as to his career change, are sufficient to demonstrate that Defendant's comments were made with reckless or negligent disregard for the truth.

Given that the statement is defamatory *per se*, actual damages are presumed; however, there are limitations on damages awarded stemming from the tangible or emotional harm that can reasonably or foreseeably be attributed to the Defendant's statements.  As discussed extensively in regard to the other claims, actual damages do exist for the embarrassment, humiliation and anxiety caused by this statement – particularly harm for the anxiety that such statements might be accessed by friends, colleagues, or potential employers.  However, the tangible evidence demonstrating the effects of the harm are limited, as discussed previously, where they are speculative and were thereby misconceived by the jury.

Specifically, there was again no harm to Plaintiff's job quest in 2007 as the statement at issue in Count V was posted several months after Plaintiff had made his employment transition to PublishAmerica  Similarly, while Plaintiff's expert witness testified that the comment could have negative hiring implications if the Plaintiff chose to seek employment beyond PublishAmerica, the opinion was unsubstantiated by evidence demonstrating the likelihood that the statement would ever "surface", particularly given that the comment does not use Plaintiff's full name, but instead refers to him only as "Vic".  Such issues were, most probably, misconceived by the jury, due to Plaintiff's continued insistence during trial that the comments were "easily accessible" by an internet search, although no evidence was presented to

substantiate that assertion.[14]  (Tr. 49-50, 248.)  Again, the comment by Defendant in the 2005

posting to the effect that any internet search as to any particular PublishAmerica party would

require full names to be used was written two years *before* the statement that is the basis of the

claim was made.  (Pl.'s Ex. 42.)  Thus, the evidence beyond Plaintiff's personal humiliation and

anxiety is limited, and a review of the evidence and testimony presented at trial evidences the

jury's confusion and misconception of the evidence, resulting in their actual damages award.

Therefore, the Court deems a reduction by the same percentage of the other claims is

appropriate, resulting in a remitted amount of $6,000.00.

Defendant also requests judgment as a matter of law, remittitur or a new trial, as to the

punitive damages of $32,000.00 awarded by the jury for the same claim.  As the Plaintiff was

able to demonstrate by clear and convincing evidence that the Defendant acted with actual

malice in posting the comment regarding the reasons Plaintiff left his former employment,

judgment as a matter of law is not appropriate.  However, while Defendant posted the comment

as part of an ongoing campaign to convince others of Plaintiff's wrongdoing, and alluded to the

fact that the true cause behind Plaintiff's change of employment was the report of ethical

violations by Defendant to the Maryland State Bar, the comment must be viewed in the context

of the series of adverse comments by Defendant and others, with the same attending

circumstances as noted in regard to the other claims for punitive damages, including the

speculative nature of accessibility by anyone on the internet. (Pl.'s Ex. 19, 22, 25, 36, 37.)

---

[14]  For example, in his opening to the jury, Plaintiff's Counsel stated that Defendant knew that when he posted these comments, he knew that they would appear on Google and then stated "[a]nd it is still out there.  Because Mr. Cretella's name, when you enter it in a Google search, comes right up."  (Tr. 50.)  No such evidence, from either Plaintiff or Plaintiff's expert, demonstrated that these comments, particularly the ones that did not utilize Plaintiff's full name, could ever have been found via an internet search of Plaintiff's name.

Accordingly, remittitur is appropriate, but resulting in an amount that reflects the jury's enhanced concern for the particular comment involved.  Therefore, where the award for punitive damages of $32,000 is a third higher than the award the jury found as to the claim in Count IV, it is appropriate to remit the award to $8,000.00 as to Count V, which is, likewise, a third higher than the award for punitive damages as to the prior claim in Count IV.[15]

**B.      Defendant's Remaining Arguments as to Misconduct by Plaintiff, Plaintiff's Counsel, and the Court.**

Finally, Defendant asserts that the Plaintiff individually and his trial counsel committed such acts, and in the case of the Court, such error, as to presumably justify at least a new trial. While all such issues appear to be rendered moot by the Court's resolution of the Defendant's motion by granting remittitur of all of the jury awards, where either the Plaintiff accepts the Court's resolution and the case is closed, or he declines to do so and a new trial ensues when such issues will be addressed if they resurface, the Court will nevertheless briefly discuss Defendant's arguments for possible appellate review.

1.      <u>Misconduct by Plaintiff and his Counsel</u>

Defendant asserts that relief is appropriate due to misconduct by Plaintiff and his counsel in advance of trial proceedings.  (Def. Mot. at 1.)  Specifically, Defendant asserts that Plaintiff utilized "phishing" software[16] during the discovery period in which he attached certain files to e-mails he forwarded to Defendant in order to retrieve information from Defendant's computer hard drive that could benefit Plaintiff's position.  (Def.'s Mot. at 1.)  Defendant asserts that

---

[15] The Court deems the higher award for punitive damages as to Count IV to be a proper reference, even though the Court has voided it, where the jury obviously placed greater emphasis on the subject comment, albeit improperly, then in regard to the other claims.

[16] "Phishing" is defined as the act of requesting confidential information over the Internet under false pretenses in order to fraudulently obtain credit card numbers, passwords, or other personal data.  <u>The America Heritage Dictionary of the English Language, Fourth Edition</u>. Houghton Mifflin Company.  (2004).

Plaintiff was seeking information about the identity of certain individuals associated with documents produced by Defendant, as well as information regarding Defendant's defense strategy.  (Def.'s Mot. at 1.)  Accordingly, Defendant asserts that a fair trial for Defendant cannot be assured, where Plaintiff had an unfair advantage.  (Def.'s Mot. at 1.)

Pursuant to Federal Rule of Civil Procedure 60(b)(3), a party may move for a new trial on the basis that the opposing party engaged in fraud, misrepresentation or misconduct during the trial process.  In order to prevail on such a motion, the party must: "(1) have a meritorious defense; (2) prove misconduct by clear and convincing evidence; and (3) show that the misconduct prevented the moving party from fully presenting his case."  Tunnell v. Ford Motor Company, 245 Fed. Appx. 283, 288 (4th Cir. 2007) (citing Schultz v. Butcher, 24 F.3d 626, 630 (4th Cir. 1994)).  Once such evidence has been established, the court balances the "policy favoring finality of judgments against the need to do justice to the moving party to determine whether a new trial is appropriate.  See id. (citing Square Constr. Co. v. Wash. Metro. Area Transit Auth., 657 F.2d 68, 71 (4th Cir. 1981)).

Here, Defendant failed to present clear and convincing evidence that Plaintiff engaged in any pretrial misconduct that prevented Defendant from fully preparing and presenting his defense in the matter.  Defendant's only evidence in support of the assertion that the Plaintiff utilized "phishing" software to retrieve information from the Defendant were the e-mails that he received from Plaintiff which only contained generic warning messages indicating that: "This message may be fraudulent and may link to fraudulent web sites;" or: "This e-mail is a suspected phishing scam."  (Pl.'s Ex. 1 & 2.)  The warning messages are general in nature and do not specifically state that there was a phishing program attached to the e-mail involved; rather the warnings cautioned that due to the size, content, or e-mail address, that "phishing" *may*

potentially be an issue of concern.  Defendant failed to substantiate such an allegation, either through expert testimony or the presentation of computer virus or "cleanup" software results indicating that the e-mails did, in fact, contain such intrusive software.  Furthermore, even if the intrusive software was attached to the subject e-mails, Defendant failed to demonstrate that Plaintiff was able to access any information or data which prevented Defendant from fully preparing and presenting his defense.  As such, Defendant's motion for a new trial on the basis of Plaintiff's alleged misconduct is without merit.

2. <u>Defendant's Arguments as to Improper Conduct by Trial Court</u>

Defendant's final argument is that a new trial should be granted due to misconduct by this Court during the trial proceedings.  Defendant asserts several bases for alleging the judicial misconduct to support his motion, namely: (1) that the Court should have noted to the jury that the Defendant's activities, such as reproducing public information, were otherwise lawful activities; (2) that the Court's discovery ruling as to Plaintiff's invocation of the attorney/client privilege was improper, thus preventing Defendant from obtaining relevant evidence in support of his defense; (3) the Court erred in allowing Plaintiff to introduce a book into evidence that had not otherwise been deemed admissible before trial; (4) the Court erred in allowing Plaintiff to selectively produce parts of a document that he had not allowed Defendant to use as evidence; (5) the Court erred in allowing Plaintiff's attorney to essentially testify during his opening statement to information never produced during the trial; (6) the Court erred by rushing the Defense's presentation of his evidence; and (7) the court did not definitively instruct Defendant as to what was going to be allowed in his closing argument, forcing Defendant to give what he describes as a "weak" closing argument.

> *a.*     *That the Court should have informed the jury that Defendant's forwarding the ethics complaint to the Maryland State Bar was legally permissible.*

51

The Defendant appears to argue that he engaged in fully-protected activity, much as occurred with the publication of the infamous Pentagon Papers, in forwarding the ethics complaint to the disciplinary authority that regulated Plaintiff's professional activities.  Aside from whether the Court had the duty to advise the jury of anything, *sua sponte*, that would assist in promoting a party's position at trial, speech that may otherwise be constitutionally-protected is not if it is defamatory, the very issue in the case and the basis for defamation actions such as this one.

       *b.*       *That the Court erred by precluding discovery disclosure of other actions in which Plaintiff and PublishAmerica injected themselves because of the attorney client privilege.*

The Defendant sought pre-trial discovery of information concerning Plaintiff's and PublishAmerica's involvement in other lawsuits of similar nature, as well as internal information as to the motive(s) for initiating this litigation.  (Docket Nos. 43, 47, 48.)  The Defendant purportedly demanded such information in an attempt to demonstrate some type of PublishAmerica policy aimed at silencing all critics such as Defendant that may somehow have been relevant to Defendant's defense by proving he was unfairly singled out.  (Def.'s Mot. at 3-4; Docket Nos. 43, 47, 48.)

The Court sustained the objection by the Plaintiff to disclosure of such information where it wasn't relevant or material to the issue of whether the Defendant – not someone else- defamed the Plaintiff as alleged, and such information was only available in the context of communication and/or work product of the Plaintiff while he was acting as counsel for his employer, and, therefore, it was clearly subject to the privilege.  (Court Order dated October 15, 2008, Docket No. 48.)

> c.      That the Court erred by allowing the Plaintiff to produce evidence that it did not allow the Defendant to offer.

The Defendant, proceeding *pro se*, attempted to introduce certain evidence, namely a book and some assorted documents, during his own direct testimony without establishing a proper foundation.  However, the Plaintiff did on his counsel's cross-examination of the Defendant, thus allowing for their admission.  (Tr. at 208.)

> d.      The Court erred in allowing testimony by Plaintiff regarding statements by the Defendant that he denies having made.

Defendant complains that Plaintiff's counsel made reference during trial to statements in prior related proceedings that counsel attributed to Defendant who denies having made them and that the Court should have prohibited such reference.  While it is difficult to discern precisely what the Defendant is referring to, suffice it to say that he could have addressed the issue in his own trial testimony and/or final argument to the jury and that any error in allowing such arguments by Plaintiff's counsel was not material to the outcome, especially when the subject statement attributed to the Defendant, and that is the basis of Defendant's argument, namely, that he "hated PublishAmerica," was otherwise clearly established.

> e.      The Court unfairly "rushed" the Defendant's presentation of the evidence.

The Defendant further complains that the Court, in effect, forced the Defendant to conclude his case prematurely because the Court assured the Defendant that the jury would have the opportunity to review all of the defense exhibits without the Defendant having to refer to each in his presentation.

The Defendants presentation of the evidence, all exhibits having already been admitted into evidence by pre-trial Order, became increasing disjointed and confusing as he, in his *pro se* capacity, proceeded.  Accordingly, while the Court could not compel the jury to examine every

exhibit, they were instructed to consider all of the evidence, and they had the opportunity to do

so.  The mere fact that the jury deliberated for less time then what time Defendant thinks they

should have in order to review all of the evidence is, of course, immaterial.

> f.    *The Court erred by not fully and carefully explaining to the pro se*
> *Defendant what he could include in his closing argument.*

Perhaps the most desperate plea by the Defendant is that the Court did not sufficiently

explain various ruling it made during the trial or otherwise counsel the Defendant as to what he

could assert in his closing argument.  Simply stated in response, the Court attempted, albeit with

difficulty at times, to maintain a neutral posture throughout the proceedings that included not

affirmatively assisting one side or the other in presenting their respective positions.  If the

Defendant had any question as to a ruling, or how to proceed procedurally, he need only have

asked.

### III. <u>Conclusion</u>

For the reasons set forth herein, Defendant's Motion to Set Aside the Verdict (Docket

No. 67) will be GRANTED IN PART, DENIED IN PART, and DENIED CONDITIONALLY

IN PART, depending on whether Plaintiff accepts the remitted awards as determined by the

Court.

An appropriate Order shall issue.

_____/s/_____
Dennis W. Dohnal
United Magistrate Judge

Richmond, Virginia
Dated:  <u>July 31, 2009</u>